Victor Salas, Jr., Esq. SBN 138107
DeJon R. Lewis, Esq., SBN 225300
LAW OFFICES OF VICTOR SALAS
674 County Square Drive
Suite 204
Ventura, CA 93003

(805) 642-9770

Attorney for Plaintiffs,
HILDA VASQUEZ, individually and as personal representative of the ESTATE OF EDGAR GARCIA, THE ESTATE OF EDGAR GARCIA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| HILDA VASQUEZ, individually and as personal representative of the ESTATE OF EDGAR GARCIA, THE ESTATE OF EDGAR GARCIA<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF SANTA PAULA; THE SANTA PAULA POLICE DEPARTMENT; Interim Chief, ISMAEL CORDERO; OFFICER HECTOR RAMIREZ, individually and in his official capacity as a Police Officer for the CITY OF SANTA PAULA; OFFICER CHAD PEPLINSKI, individually and in his official capacity as a Police Officer for the CITY OF SANTA PAULA; AND DOES 1 to 50, inclusive, individually and in their official capacities as POLICE OFFICERS for the CITY OF SANTA PAULA.<br><br>Defendants. | CASE NO. CV 13-07726- CBM (AJWx)<br><br>Judge: Consuelo B. Marshall<br><br>**PLAINTIFFS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW PER LOCAL RULE 16-4**<br><br>Pretrial Conference: January 13, 2015<br>Trial: February 17, 2015 |

Pursuant to Local Rule 16-4, Plaintiffs hereby submit their Memorandum of Contentions of Fact and Law.

I. **PLAINTIFFS' CONTENTIONS OF FACT**:

A. The incident giving rise to this claim occurred on July 28, 2012 at approximately 7:46 p.m. Santa Paula Police officers responded to a residential disturbance call at 1117 New Street in the CITY OF SANTA PAULA, County of Ventura, State of California. During her radio call, the dispatcher immediately indicated to responding officers that "EDGAR GARCIA" was the party sought. Upon their arrival, two officers allegedly were fired upon by some unknown suspect and as a result, Officer Chad Peplinski was shot in the buckle of his belt and an "Officer Down" call came out on the radio thereby summoning more police response.

B. Immediately after the gunfire and chaos, EDGAR GARCIA was observed running to the rear of the residence where he was met by Officer Hector RAMIREZ, who had been lying in wait on the northern most side of the cinder block retaining wall separating 1117 New Street from the property directly behind the residence to the North. Officer RAMIREZ claims that EDGAR GARCIA attempted to jump onto the north retaining wall where he was waiting and upon seeing him (Officer RAMIREZ), Mr. GARCIA jumped down and back into the backyard. Officer RAMIREZ claims that he, too, jumped down on the opposite side of the retaining wall to draw his weapon. After obtaining his weapon, Officer RAMIREZ, who is approximately 5'9" tall, claimed that he stood upon several tires to peer over the six foot (6') cinder block wall and upon visually locating Mr. GARCIA, immediately ordered him to get down on the ground (disputed). It is this crucial time that there are conflicting reports as to what actually happened next.

C. In an audio recording of the incident recorded by Officer Scott Varner as it happened, Officer RAMIREZ, when asked what happened by Senior Officer Scott Varner, claimed that EDGAR GARCIA stated "he pointed a gun at me, I Shot back." At his deposition, Officer RAMIREZ claimed that EDGAR GARCIA was turned in his direction and while back peddling, pointed his weapon at him while making "jerking movements." Plaintiffs are of the belief that RAMIREZ made this claim in an attempt to make it appear that EDGAR was attempting to shoot his weapon at him. It needs to be established at this time that at her deposition, Ventura County Sheriff's Department Forensic Scientist, Janey Dunn, testified that Mr. GARCIA's weapon was operational and had a round in the chamber at the time it was recovered on the ground by law enforcement after EDGAR GARCIA was shot, thereby disproving Officer RAMIREZ's allegation that Mr. GARCIA was attempting to shoot him. Also, while listening to Scott Varner's recording, Officer RAMIREZ while testifying at his deposition was asked if he could hear himself telling Mr. GARCIA to "get down." He admitted that he could not.

D. Officer RAMIREZ admits that he shot six (6) rounds at Mr. GARCIA while at a time when Mr. GARCIA was only 10' away from him and as he was "back peddling" eastbound while allegedly pointing his weapon at the officer. Because Officer RAMIREZ missed him six (6) times at point-blank range, Mr. GARCIA, fearing for his life, turned toward the east and ran toward the Eastern Cinder Block retaining wall of the residence in an attempt to escape Officer RAMIREZ' attempts to shoot and kill him. While running away from the officer and while his back was towards Officer RAMIREZ, Officer RAMIREZ elected to kill Mr. GARCIA by firing an additional 7th and 8th round at Mr.

GARCIA who at this time, as admitted by Officer RAMIREZ, was approximately forty (40') feet away from him. At his deposition Officer RAMIREZ admitted not seeing any weapon in Mr. GARCIA's hands during the time he was firing his 7th and 8th shots as well. Officer RAMIREZ admits that there was no one else in the backyard with he and EDGAR GARCIA at this time as too, but claimed that he shot Mr. GARCIA because he feared for his safety, the safety EDGAR GARCIA'S family, of his fellow police officers, the public and the safety of the dispatchers who were several blocks away at police headquarters. It was at this point that the evidence shows that Officer RAMIREZ Shot his 40 Caliber Handgun at Mr. GARCIA striking him in the back once whereby the bullet exited through his chest just right of his left nipple and reentered his left forearm and exiting it as well. As a result, Officer RAMIREZ reports that Mr. GARCIA turned his body towards him and screamed a very loud primal yell at him, dropped to his knees (one at a time), and fell down on his face.

E. Officers Huerta, Shilo and RAMIREZ assisted each other in handcuffing Mr. GARCIA in the Prone position and allowed him to lie there for approximately 18.5 to 19 minutes before any medical personnel were allowed to attempt to treat him. No officers, admittedly, ever provided Mr. GARCIA any direct pressure or any other emergency medical services. Several witnesses of this incident have testified at deposition; emergency personnel, police officers and citizens who witnessed the shooting. Each of those witnesses, including the medical examiner who performed the autopsy of Mr. GARCIA, Dr. Ronald O'Halloran, testified that the amount of time Mr. GARCIA lay on his stomach bleeding from the back/chest wound was anywhere from 18.5 to 19 minutes.

F. Officer Huerta, who too was recording the entire incident, was ordered to secure the backyard and Mr. GARCIA while the residence was being "cleared." Officer Huerta, too, recorded the entire event. In Officer Huerta's recording of the incident, you can hear the labored agonal breathing of EDGAR GARCIA and essentially him taking his last breaths while Officer Huerta, who was not in the backyard during the exchange with Officer RAMIREZ and who had not yet had an opportunity to discuss the matter with Officer RAMIREZ, began yelling at Mr. GARCIA "why did you point your gun at the officer" in an attempt to admittedly elicit a dying declaration from the gravely injured EDGAR GARCIA. At his deposition, Officer Huerta admits that he had no basis for asking that question from the dying EDGAR GARCIA but that he was trained to do that.

G. Other than giving his death cry, EDGAR GARCIA never said anything after he was shot by Officer RAMIREZ, but there is no doubt that he experienced great pain and suffering as a result of receiving a through and through shot to the back and left forearm. When asked why he shot at the fleeing EDGAR GARCIA, Officer RAMIREZ claimed that he was allowed to do so to protect other officers and the public, however, at his deposition RAMIREZ testified that there was no other officers or persons in the backyard of the residence other than himself and EDGAR GARCIA.

H. The SANTA PAULA POLICE DEPARTMENT's General Order No. 8-1 VI requires that a suspect injured at a scene be provided medical attention immediately, once it is safe to do so. The SANTA PAULA POLICE DEPARTMENT claims that the reason they failed to provide immediate medical attention to EDGAR GARCIA was because they had to clear the residence first before they would allow Medical

Personnel to come upon the property. This condition precedent was caused mostly because of an intentionally false report made by Reserve Officer Shilo immediately after the shooting. Officer Shilo claimed that he observed four outstanding suspects jumping over the same northern cinder block retaining wall that Officer RAMIREZ was posted on. The problem here is that Officer RAMIREZ testified and denied ever seeing any such suspects at his deposition. However, on officer Varner's recording of the entire event, including Reserve Officer Shilo's claim, Officer's Varner, Shilo, Peplinski and RAMIREZ were all present and in close proximity to one another and at no time did Officer RAMIREZ deny Reserve Officer Shilo's claim in order to prevent the expenditure of the minimal police resources at the scene to locate these "outstanding suspects" and to secure the scene.

I. While Mr. GARCIA lay handcuffed behind his back, profusely bleeding from his chest arms and mouth, and placed in the prone position with his mouth and nose pointing perpendicular to the ground, Officer Scott Varner stood outside the residence and asserted that they (the police) needed to "clear the residence" on three (3) separate occasions over a four (4) to five (5) minute period of time. During the search of the residence, it can be heard and Officer Varner testified to and confirmed, that he could hear and identify on his audio recording Officer RAMIREZ, whom he had ordered to stay with Officer Peplinski, transmitting over the police radio to medical personnel to "stand by." This is the same man who less than six (6) minutes prior, shot EDGAR GARCIA. It took Officer Varner and two other law enforcement officers approximately 13 to 14 minutes to clear the approximately 1400 sq foot home. Officer Varner admits that he did

not have enough police personnel at the scene when he began his search. It should be noted that after Mr. GARCIA was shot and handcuffed, Officer Varner on his police radio told Sheriff's personnel who were responding to the scene to "downgrade" which means to turn off their lights and sirens and take their time. During his search, Officer Varner testified that he could hear over his radio Sgt. Cody Madison, who now was the senior person at the scene, clear medical to the residence some 14 minutes after Mr. GARCIA was shot without clearing it through him. He later admitted that he still felt the scene was unsafe but did not discuss this with Sgt. Madison.

J. Despite Sgt. Madison's clearing medical personnel to go to the rear of the residence, medical still did not reach Mr. GARCIA for another 4 to 5 minutes.

K. Plaintiffs are of the belief and thereon allege that had Reserve Officer Shilo not put this false report out at the scene, emergency medical responders, who were staged outside the perimeter of the scene, would have been allowed to enter the residence and possibly save the life of EDGAR GARCIA or at the very least provide him with pain medication and medical treatment that would have made him comfortable before he expired, instead of causing him to have to endure the pain and suffering he did based on a false allegation of Officer Shilo.

L. EDGAR GARCIA died like a dog by the hands of the SANTA PAULA POLICE DEPARTMENT. At the end of Officer Scott Varner's recording of the shooting, some of the officers discuss this false report and determine that it was in fact, falsely made by Reserve Officer Shilo.

M. At is deposition, Ventura County Medical Examiner Dr. Ronald O'Halloran, M.D. testified that had Mr. GARCIA received proper immediate medical treatment and got to a trauma center quickly, Mr. GARCIA may have survived the shooting.

## II. PLAINTIFFS' CONTENTION OF LAW:

A. *Tennessee v. Garner*, 471 U.S. 1, (1985).

Plaintiffs are of the belief and thereon allege that the shooting of EDGAR GARCIA was not Justifiable and does not meet the constitutional standards in the holding of *Tennessee v. Garner*, 471 U.S. 1, (1985). In Garner, the Court held that deadly force was not proper unless an "officer has probable cause to believe that the suspect poses a ***significant*** threat of death of serious physical injury to the officer or others." *Emphasis added*

B. *Graham v. Connor*, 490 U.S. 386 (1985):

The standard for review of an excessive force case is an objective one pursuant to the holding in *Graham v. Connor*, 490 U.S. 386 (1985) (1985). In *Graham*, Justice Rehnquist, writing for the Majority, stated that "*all* claims that law enforcement officers have used excessive force-deadly or not- in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard, rather than under a "substantive due process" approach. . . .

The factors cited in *Graham* are as follows:

1. The severity of the crime at issue;
2. Whether the suspect poses an immediate threat to the safety of the officers or others; and
3. Whether he is actively resisting arrest or attempting to evade arrest by flight; See *Tennessee v. Garner*, 471 U.S., at 8-9

Here, Plaintiffs contend that Officer Ramirez was unable to state any felony that he observed EDGAR GARCIA commit, that at best, Mr. GARCIA pointed the gun at him but did

not fire it. Instead, Officer RAMIREZ states, as heard on the audio recording made by Officer Scott Varner as the incident actually happened, "he pointed a gun at me, I shot back."

Plaintiffs further contend that EDGAR GARCIA was not actively resisting arrest at the time that he was shot, but was in fact attempting to escape Officer RAMIREZ' attempts to kill him when he was in fact shot in the back by Officer RAMIREZ. Officer RAMIREZ admitted at his deposition that he shot Mr. GARCIA at a time when his back was pointed towards him and as he was running away. He further admits that he did not see any weapon in possession of Mr. GARCIA at the time he fired the fatal shots.

C. *Cruz v. City of Anaheim,* No. 12-55481 (9th Cir. 2014):

In *Cruz*, Judge Kozinski, citing *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994) stated "we cannot 'simply accept what may be a self-serving account by the police officer' because the person most likely to rebut the officers' version of the events—the one killed—can't testify, '[t]he judge must carefully examine all the evidence in the record . . . to determine whether the officer's story is internally consistent and consistent with other known facts.'"

In the instant matter, Plaintiffs contend that Officer RAMIREZ was not authorized to use deadly force and did violate GARCIA'S 14th amendment rights because he was not justified to do so because Mr. GARCIA was not posing an immediate threat to him or the public by running the opposite way from the officer, who was standing behind a 6' cinder block wall and could not see any weapon in Mr. GARCIA'S hands as he ran from him and at the time he made the fatal shots.

D. *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978):

The CITY OF SANTA PAULA AND THE SANTA PAULA POLICE DEPARTMENT Claim that the Police Department did nothing to raise any Municipal Liability under a Monell Theory.

*Monel*l authorizes Section 1983 lawsuits against Police Departments and Municipal entities when their policies, customs, and practices are responsible for the Unconstitutional Deprivations of Citizen's rights.

E. *City of Canton v. Geraldine Harris*, 489 U.S. 378, (1989):

*City of Canton* is the leading U.S. Supreme Court Case regarding failure to train police officers. The Court in *City of Canton* reasoned that "the inadequacy of police training may serve as the basis for Section 1983 liability only where the failure to train in a relevant respect amounts to deliberate indifference to the constitutional rights of persons with whom the police come into contact . . . ; that a city is not liable under Section 1983 unless a municipal "policy" or "custom" is the moving force behind the constitutional violation. Only where a failure to train reflects a "deliberate" or "conscious" choice by the municipality can the failure be properly thought of as an actionable city "policy." In *Canton*, the court reasoned that municipalities are deliberately indifferent to the inhabitant's Constitutional rights when they don't train their officers regarding the appropriate use of force in the "obvious areas" of police work where force can be foreseeable.

Footnote No. 10 of the *Canton* decision helps to explain the obviousness rule here in its entirety:

> For example, city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with fire3arms, in part to allow them to accomplish this task. This, the need to train officers in the constitutional limitations on the use of deadly force, see Tennessee v. Garner, 471 U.S. 1, 105 S.Ct. 1964, 85 L.Ed.2d 1 (1985), can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.
>
> It could also be that the police, in exercising their discretion, so often violate constitutional rights that the need for further training must have been plainly obvious to the city policymakers, who, nevertheless, are "deliberately indifferent" to the need.

F. SANTA PAULA POLICE DEPARTMENT, General Order 8-1:

General Order 8-1 outlines the SANTA PAULA POLICE DEPARTMENT'S policies and procedures regarding the Use of Deadly force, and when to provide medical attention to a detainee/suspect who has been injured as a result of one its officer's use of deadly force upon the

detainee/suspect. Defendants, allege that said policy was adhered to in this matter and that it meets 14th Amendment U.S. Constitutional muster.

Plaintiff's contend that it does not!

DATED: 12-22-14

LAW OFFICES OF VICTOR SALAS, JR.

By:____________________

Victor Salas, Jr.
DeJon R. Lewis
Attorneys for Plaintiffs HILDA VAZQUEZ and the ESTATE OF EDGAR GARCIA